FILED

2024 Jun-12  AM 11:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| BRADLEY R. CHITTHAM, | ) | CIVIL ACTION NO.: |
| | ) | 1:24-CV_____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| UNITED LAUNCH ALLIANCE, LLC | ) | |
| | ) | |
| Defendant. | ) | |

**ORIGINAL COMPLAINT**

COMES NOW, PLAINTIFF, Bradley R. Chittam ("Plaintiff"), by and through undersigned counsel, files this Original Complaint ("Complaint"), complaining of DEFENDANT, United Launch Alliance, LLC, ("Defendant") and hereby states as follows:

## I.      INTRODUCTION

1.      This is an action for legal and equitable relief to redress Defendant's unlawful discrimination, harassment, and retaliation predicated on Plaintiff's disability, medical capabilities, and sincerely held religious beliefs as a Christian.

2.      This suit is brought to seek a declaratory judgment that Defendant has engaged in an uncontainable pattern and continued practice of disability, medical, and religious discrimination and retaliation in employment opportunities and substantially deprived Plaintiff's fundamental civil rights and liberties due to unlawful conduct taken against Plaintiff, which was unreasonably intrusive, substantially burdensome, unlawful, and contrary to existing law.

3.      Furthermore, this action is sought to ensure the protection provided for in and to redress the deprivation of such rights secured by the United States Constitution, the Americans with Disabilities Act ("ADA"), the Religious Freedom Restoration Act ("RFRA"), Section 504 of

1

the Rehabilitation Act ("§ 504"), 42 U.S.C. § 1983 (§ 1983), and Alabama state laws, which provide for relief against discrimination, harassment, and/or retaliation in employment on the basis of religion, disability, and other unlawful instances of tortious conduct against an individual.

4. This lawsuit is grounded in Defendant's discriminatory, harassing, retaliatory, coercive, and intrusive conduct, which was predicated on Plaintiff's disabilities, medical capabilities, and sincerely held religious beliefs against the creation, implementation, and facilitation of messenger ribonucleic acid ("mRNA") mRNA Sars Coronavirus ("COVID-19") vaccinations that use stem cells from aborted fetal tissue and the unreasonable intrusion into his personal autonomy.

5. Additionally, this lawsuit is grounded upon Defendant's creation, implementation, administration, and enforcement actions concerning its "COVID-19 Vaccination Mandate," "COVID-19 Testing Policy," "COVID-19 Masking Policy," and "COVID-19 Social Distancing Policy," (collectively "COVID-19 Policies") and conduct related thereto, which was undertaken at the direction and encouragement of the Government.

6. Specifically, on the basis of his medical capabilities as an individual who has a recognized disability under the ADA and sincerely held religious beliefs as a Christian, Plaintiff that Defendant: discriminated against his religious rights due to the creation, implementation, and enforcement of discriminatory COVID-19 Policies; failed to engage in the interactive process; disregarded his religious exemption and accommodation request that were submitted to seek relief from Defendant's execution of its novel COVID-19 Vaccine Policies; harassed Plaintiff on the basis of his Christian beliefs and disabilities through tactics to compel compliance of Defendant's novel COVID-19 Policies at the expense of his sincerely held beliefs; discriminated against him when Defendant only implemented certain policies and procedures that intentionally targeted and

impacted Christians; significantly encumbered Plaintiff's ability to exercise his religion due to the discriminatory and harassing conduct; discriminated against Plaintiff and against others with disabilities and Christians on the basis of religion in the terms and benefits of their employment including pay, promotion and discipline, and unlawfully terminated Plaintiff and others once they opposed the religious harassment and discrimination.

7.    Plaintiff challenges the policies and actions detailed herein on their face and as applied to Plaintiff.

8.    Defendant's policies and actions deprived and will continue to deprive Plaintiff of his fundamental rights and liberties afforded to him under the U.S. Constitution and federal law.

9.    Defendant committed each and every act alleged herein under the color of law and authority of the state and federal government (collectively "Government"),

10.    Plaintiff seeks a permanent injunction and other equitable relief necessary to eliminate the effects of Defendant's past and present religious and disability discrimination and to prevent such discrimination from continuing to adversely affect Plaintiff's live and careers, including but not limited to: affirmative restructuring of the promotion selection procedures, training, pay and other terms and conditions of employment.

11.    Plaintiff seeks damages, back pay and other equitable remedies necessary to make Plaintiff whole.

12.    Plaintiff seeks compensatory and punitive damages, requests a trial by jury of all issues triable by a jury, and seeks reasonable attorneys' fees and costs.

## II.    PARTIES

13.    **Plaintiff Bradley R. Chittam** is an adult Tennessee resident who currently resides in Williamson County, Tennessee.  Plaintiff was an aerospace technician who had worked as a

full-time employee at Defendant's business from 2008 until termination during December 2021. Plaintiff may be served by and through undersigned counsel.

14. **Defendant United Launch Alliance, LLC,** is a foreign for-profit corporation with facilities in Decatur, Alabama, and across the United States. Defendant conducts business in Alabama with its principal office located at 1001 Red Hat Rd, Decatur, AL 35601

### III.   MISNOMER/ALTER EGO

15. In the event any parties are misnamed or are not included herein, it is Plaintiff's contention that such was a "misidentification," "misnomer," and/or such parties are/were "alter egos" of parties named herein.  Alternatively, Plaintiff contend that any "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

### IV.   JURISDICTION AND VENUE

16. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, 1343, and 42 U.S.C. § 12101, and 42 U.S.C. §§ 12112, 12117(a), and 12203, which include and/or incorporates by reference the ADA, 42 U.S.C. § 12101, *et seq.*, the RFRA, 42 U.S.C. § 2000bb *et seq.*, § 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and civil rights and liberty protections afforded by § 1983, 42 U.S.C. § 1983 *et seq.*, which provide for relief against discrimination, harassment, and retaliation in employment on the basis of enumerated characteristics of religion and disability.

17. This Court has personal jurisdiction over Defendant because the entity has sufficient minimum contacts with the state of Alabama and has purposefully availed itself to the benefit of doing business in the state.  Such exercise of personal jurisdiction does not offend the constitutionally recognized traditional notions of fair play and substantial justice.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

19.     Plaintiff has satisfied all administrative conditions precedent for the filing of this action under the ADA.

20.     Plaintiff has timely filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  *See* Plaintiff's Charge of Discrimination, attached as Exhibit 1.  Plaintiff has received a Right-To-Sue Notice and brought forth this action within the ninety (90) day timeframe required under federal law.  *See* Plaintiffs' Discrimination Right-to-Sue Letter, attached as Exhibit 2.

21.      Plaintiff has timely filed his charge of retaliation with the EEOC and Plaintiff has Plaintiff has received a Right-To-Sue Notice and brought forth this action within the ninety (90) day timeframe required under federal law.  *See* Plaintiff's Charge of Retaliation, attached as Exhibit 3; *see also*  Plaintiffs' Retaliation Right-to-Sue Letter, attached as Exhibit 4.

## V.     FACTS

### A.     COVID-19 Background and Executive Order 14042

22.     From the last four (4) years, the United States ("U.S.") responded to a public health emergency of respiratory diseases caused by a novel coronavirus named "severe acute respiratory syndrome coronavirus", commonly known as COVID-19, which has been detected in over 190 countries internationally, all fifty (50) States, the District of Columbia, and all U.S. territories.

23.     Since the spread of the disease, at least three (3) separate mRNA COVID-19 vaccines have been developed and were initially authorized for emergency use in the U.S.

24.     From 2021 into the present, the Center for Disease Control ("CDC") COVID-19 has stated the vaccines only <u>lessen</u> the effects of the virus, do not completely inoculate an individual from contracting the virus, nor does the vaccine prevent the transmission of the virus. Accordingly, an individual's vaccination status does not prevent an individual from contracting or transmitting COVID-19, even for those who are vaccinated and boosted.

25.     On September 9, 2021, President Joseph R. Biden signed Executive Order 14042 ("EO 14042"), which required all "covered contractors", meaning any private business entity with contract and/or contract like instruments with the Government, to be vaccinated by January 13, 2022, which was then extended to January 18, 2022, unless an individual employee was legally entitled to an accommodation.

26.     In specific, EO 14042 stated the following:

Section 1.  Policy.  This order promotes economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument as described in section 5(a) of this order.  These safeguards will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government.  Accordingly, ensuring that Federal contractors and subcontractors are adequately protected from COVID-19 will bolster economy and efficiency in Federal procurement.

*See* Exh. 5 – EO 14042 Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors.

27.     EO 14042 was previously subject to a nationwide federal injunction and was never enforced by appropriate delegated Government agency tasked with enforcement, the Office of Management and Budget ("OMB").

**B.      Defendant's Status as a State Actor Operating Under the Color of Law**

28.    Individual private corporations that have "contracts and/or contract-like instruments" with the federal government, which assist in the design, creation, construction, manufacturing, and/or otherwise related good or services provided to the Government pertaining to the promotion and sustainment of "defense" of the U.S. are subject to EO 14042 if the executive order was ever to take effect on and/or after January 18, 2022.

29.    Moreover, a "defense contractor" is a business organization or individual that provides products or services to a military or intelligence department of the Government, whether federal or state.

30.    A defense contractor's business products often include military or civilian aircraft, ships, vehicles, weaponry, and electronic systems, logistics services, informational technological support, technical support and training, communications support, and engineering support, which is undertaken in direct cooperation and supervision with and by the Government alongside the Government's numerous Government officials stemming across multiple federal and state agencies that include but are not limited to the following Government agencies: NASA, Department of Defense ("DOD"), U.S. Space Force, Central Intelligence Agency ("CIA"), Federal Bureau of Investigation ("FBI"), the National Reconnaissance Office ("NRO"), and CDC.

31.    In the case at hand, Defendant is defense contractor, an American aerospace manufacturer, and a launch service provider, which manufactures and operates rockets, *inter alia*, that launch spacecraft and satellite surveillance technologies into Earth's orbit and on trajectories to other bodies in the Solar System in addition to across the world as needed by the Government.

32.    Defendant's parent business organizations are the Boeing Company, Boeing Defense Space & Security, Lockheed Martin, and Lockheed Martin Space, which are all American

multinational defense contractor corporations with offices located within the U.S. and around the world.

33.     Defendant's first joint-parent company, the Boeing Company, oversees the business operations of Defendant, is the fourth (4th) largest defense contractor in the world, and is responsible for the design, manufacturing, and sale of airplanes, rotorcraft, rockets, satellites, and missiles worldwide.

34.     Defendant's parent entity, the Boeing Company, received from the Government over $63 million in COVID-19 relief funds appropriated by the Defense Protection Act Title III ("DPA") and at minimum $200 million in COVID-19 funding pertaining to the COVID-19 pandemic appropriated from the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

35.     Defendant's other joint-parent company, Lockheed Martin, oversees the business operations of Defendant as well, is the second (2nd) largest defense contractor in the world, and is responsible for the design, manufacturing, and sale of airplanes, rotorcraft, rockets, satellites, and missiles worldwide, and provides aerospace, military support, security, and technology to the U.S. Government; in specific, Lockheed Martin provides the aforementioned services to multiple federal and state agencies, such as the DOD, which comprise of nearly fifty (50%) percent of the business entity's annual sales revenue, NASA, U.S. Space Force, and U.S. Department of Energy ("USDE").

36.     Defendant's parent entity, Lockheed Martin, received from the Government over $100 million dollars to the company and its subsidiaries in the form of COVID-19 relief funds appropriated by the DPA and at minimum $320 million in COVID-19 funding pertaining to the

COVID-19 pandemic appropriated from the CARES Act which does not include Lockheed Martin's subsidiaries.

37.    Defendant's parent entities were to distribute these awarded COVID-19 funds and grants to Defendant and it is presently understood that Defendant is in receipt of several millions of dollars' of COVID-19 funds and grants from the Government and Defendant's parent entities that were provided to Defendant and Defendant's parent entities by the Government with assurances and guarantees that Defendant was to utilize the awarded COVID-19 funding and grants for purposes related to providing a healthy and safe environment for Defendant's employee workforce as well as maintain the facilities integrity so that Defendant is not forced to shut down and/or inhibit critical infrastructure and national security interests, which would place the U.S. in direct harm from foreign and national threats; thus, Defendant's award of COVID-19 funding and grants is seen as a public service in furtherance of the Government's primary role, objective, and purpose that is enumerated within the Preamble of the U.S. Constitution to protect, promote, and defend the general welfare of the U.S.'s citizens from all threats.

38.    Specifically, in Defendant's own position statement to the EEOC in response to Plaintiffs' Charges of Discrimination and Retaliation, Defendant characterizes its business and business operations as:

> ULA is a joint venture of Lockheed Martin Corporation and The Boeing Company, formed in 2006 to construct and launch rockets for a variety of government and commercial customers. Among ULA's government customers are NASA, the United States Space Force, and the National Reconnaissance Office (NRO), and for these customers ULA is tasked with the timely launching of satellites directly affecting national safety and security interests. To date, ULA has achieved more than 140 consecutive successful launches. ULA guarantees assured access to space and fuels local economies with a nationwide team of approximately 2,700 employees, including approximately 660 located at its production facility in Decatur, Alabama.

*See* Exh. 6, Defendant's EEOC Position Statement.

39.     Defendant's business primarily revolves around the construction of large rockets and space exploration modules, which are then used by the U.S. military branches consolidated within the DOD, U.S. Space Force, NASA, and the NRO.

40.     Based upon the nature, type, amount, specialization, and substantial business operations undertaken by Defendant, Defendant is defined, pursuant to federal law regulations and through self-identification, as a federal contractor that has contracts or contract-like instruments with U.S. and state governments.

41.     Defendant is required to follow EO 14042 if the executive order ever went into effect; however, EO 14042 has never went into effect at any time since its initial announcement in September 2021 and was held unconstitutional by the Eleventh Circuit Court of Appeals.

42.     Defendant's purported reason for the creation, implementation, and enforcement of its COVID-19 Vaccination Mandate, COVID-19 Testing Policy, COVID-19 Masking Policy, COVID-19 Social Distancing Policy was because they were following the direction of the U.S. federal government, specifically following the direct and encouragement of the DOD, U.S. Space Force, NASA, CDC, NRO, OMB, and the White House.

43.     Defendant's actions and COVID-19 Policies were all undertaken in accordance with policies, practices, customs, and procedures created, adopted, and enforced under color of laws dictated to Defendant by the Government and specific Government officials operating in their official capacity in specifically advising and commanding particular compliance conduct to Defendant and Defendant's senior executive leadership staff members and Plaintiff's immediate managers, such as Elizabeth Johnson.

44.     In doing so, Defendant was acting in the capacity to continually serve the national security interests of the Government in protecting its citizens from COVID-19, providing for the

common defense, deterring domestic and foreign threats, safeguarding and producing satellites and rocket technologies for U.S. intelligence operations, and ensure freedom and protection of American citizens is achieved.

45.     Furthermore, Defendant's efforts to comply with EO 14042 were <u>entirely</u> predicated on the Government's instruction, encouragement, and guidance concerning full vaccination of COVID-19, virtual denial of COVID-19 accommodation requests by defense contractor employees, non-appropriation and expenditure of COVID-19 funds on employees, and other drastic commandments by specific high-ranking Government officials from the OMB, DOD, U.S. Space Force, CDC, and other Government agencies during Summer and Fall 2021 to Defendant's senior executive leaders, including but not limited to: Chief Executive Officer Salvatore T. "Tory" Bruno; Chief Operating Officer John Elbon; Vice President and General Counsel Sondra Barbour; Chief Financial Officer Christopher Wolter; Vice President and Controller Mitch Van Dewerker; Chief Information Officer Andrew Blackmon; and Vice President of Finance and Strategic Partnerships Steve Furuto.

46.     Defendant and the Government's actions concerning the treatment of COVID-19 Policies, appropriation of COVID-19 funds and grants, expenditure of the received COVID-19 funds and grants, and Defendant's unilateral decision to deny every single exemption and accommodation request submitted by Defendant's employees in response to Defendant's Vaccination Mandate was <u>significantly intertwined</u> with the Government's own COVID-19 policies, agenda, decision making, efforts to prevent the spread of the virus, and the Government's decision to deny over ~99% of over 16,000 COVID-19 exemption requests submitted by U.S. military servicemen and servicewomen within the U.S. Army and U.S. Air Force during the same time period in response to the Government's COVID-19 vaccination mandate.

47.     Defendant's COVID-19 Testing Policy, which was applicable for those who had received an exemption and/or those employees who were not subjected to the policy because that individual employee of Defendant had received the mRNA COVID-19 vaccination within the prescribed deadline, was ultimately out of date, out of touch, and out of time since Defendant's COVID-19 Testing Policy was never in-fact implemented after Defendant cited such contentions to the EEOC, to Plaintiff, and to other employees since Defendant's COVID-19 Testing Policy and COVID-19 Vaccination Mandate were never enforced and/or utilized by Defendant after January 18, 2022, which was identical to the decision announced by the Government.

48.     Defendant's announcement, creation, implementation, and enforcement of Defendant's COVID-19 Vaccination Mandate is exactly analogous to the Government's own COVID-19 vaccination mandate in every possible manner.

C.     Defendant's COVID-19 Mandates, Policies, and Exemption Decision

49.     In direct response to EO 14042 as well as the specific encouragement, instruction, guidance, commandments, and intertwinement of the Government and Defendant's conduct concerning policies, procedures, and regulations concerning COVID-19, Defendant enacted four (4) distinctive policies concerning COVID-19 to purportedly assist in the minimization of injury of the virus: (1) "COVID-19 Masking Policy"; (2) "COVID-19 Social Distancing Policy"; (3) "COVID-19 Vaccination Mandate"; and (4) "COVID-19 Testing Policy."

50.     Defendant's COVID-19 Masking Policy was announced on or about March 2020 and required employees and visitors to wear facial mask protections while at Defendant's facilities.

51.     Defendant's COVID-19 Social Distancing Policy was announced on or about March 2020 and required employees and visitors to physically separate themselves in excess of six (6) feet while at Defendant's facilities.

52. Defendant's COVID-19 Vaccination Mandate regarding mandatory compulsion of Defendant's employees' receipt of one of the three (3) mRNA COVID-19 vaccinations was announced on September 1, 2021.

53. Directly coinciding with Defendant's COVID-19 Vaccination Mandate is "Defendant's Testing Policy", announced on and/or days after September 1, 2021, which would allow individual employees who did not receive the COVID-19 vaccination due to a granted exemption and/or individual employees who did in-fact receive the COVID-19 vaccination to be tested upon entrance into the facility.

54. In conjunction, all of Defendant's four (4) COVID-19 policies, regulations, and procedures encompassed during Plaintiff's time of employment at Defendant's business are collectively referred to as the "COVID-19 Policies" and were specifically designed and undertaken by Defendant clearly operating under the color of law by the Government during the COVID-19 pandemic.

55. The Government and Defendant's COVID-19 Policies purportedly "help to minimize the spread" of the virus and promote the health and safety of the Government and Defendant's workforce; however, this claim is entirely fallible, as such conduct by the Government and Defendant actually enhanced the spread and likelihood of contraction of the virus due to the faulty logic of the Government's and Defendant's COVID-19 Policies.

56. The Government's and Defendant's health and safety policies, specifically Defendant's COVID-19 Policies, were contrary to the globally recognized health and safety standards adopted and known throughout human history due to the fact these efforts were predicated on total prevention of a virus' spread through seeking the compulsion of a generalized mass population to receive a vaccine through inoculation efforts of an everchanging virus, which

at this point in human history and development is medically impossible, as opposed to utilizing medical science to eradicate a disease based upon components containing a bacterium strain.

57.     Furthermore, Defendant's COVID-19 Policies were antithetical to its purported health and safety objectives and placed Plaintiff and other employees at further risk due to Defendant's allowance of every member of its vaccinated workforce to: (i) not wear facial protection, (ii) not socially distance; and (iii) not be subject to testing and contact tracing.

58.     Defendant's COVID-19 Policies were enacted, implemented, and enforced despite the contentions made by the CDC and manufacturers of the COVID-19 vaccines regarding the ineffectiveness of the vaccine to provide total inoculation, vaccine ineffectiveness on the specific strain of virus that develops constant mutations, and medically documented health related effects that had occurred in both male and female human subjects only days after receipt of the vaccine.

59.     Defendant's determination to draft, enact, implement, execute, enforce, and enact the COVID-19 Policies were undertaken at the direction and encouragement of the Government due to Defendant's exclusive and distinctive relationship with the U.S. Government that is virtually indistinguishable during the COVID-19 pandemic from 2020 until Defendant's termination of Plaintiff on December 2021.

60.     Defendant's COVID-19 Vaccine Mandate for its employees was announced: (i) over 580 days after the World Health Organization declared a global pandemic on January 30, 2020; (ii) only days before President Biden's announcement of EO 14042 and in response to the EO 14042; and (iii) only allowed for Defendant's employees only several days to be vaccinated and/or to submit an exemption request for accommodations based upon only religious or medical reasons.

61.    Defendant loosely identified the procedure to seek accommodations through the submission of a religious and/or medical exemption but did so in vague and ambiguous terms, which impeded Plaintiff and other employees ability to request exemptions, led to confusion regarding the methods and means to seek accommodations as well as the process, and disallowed Plaintiff and other employees from submitting both religious and medical exemption requests through predatory actions to disincentivize and misrepresent Plaintiff's afforded constitutional rights under federal and state laws.

62.    Each of Defendant's COVID-19 Policies were inflexible, were in contrast to established tenets of health science and the pathology of viruses, and constituted a significant intrusion into the fundamental rights to bodily integrity and religious freedoms of Plaintiff as well as led to exacerbations of Plaintiff's existing disability and medical complications.

63.    For several months September through December 2021, Plaintiff was required to attend  "closed-door" meetings and/or "question and answer" meetings in which participants, primarily managers and supervisors, were not able to record or take pictures and were situated closely together without masks in violation of Defendant's COVID-19 Policies.

64.    Plaintiff particularly felt subjectively threatened and harassed by the Defendant's stance and verbiage on mRNA vaccines in its weekly presentations and forced mandatory meetings regarding the COVID-19 Policies with multiple staff members that placed Plaintiff and his family at risk due to Plaintiff's goings to and from the home environment to Defendant's facility in Decatur, Alabama.

65.    Plaintiff was subjected ridicule, retaliation, and discrimination for Plaintiff's disability, medical complications, and religious beliefs and would experienced harmful misrepresentative statements such as generally, "if you submit a exemption request you shall not

go and attempt to receive the vaccine" because in doing so it would "prove your exemption request was not valid" and Plaintiff and others would be subject to admonishment for having engaged in such a manner.

66.    On September 22, 2021, Plaintiff timely submitted his "Request for Medical Exemption" from the COVID-19 Vaccine Mandate.  *See* Plaintiff's Medical Exemption Request, attached as Exhibit 5.

67.    In Plaintiff's Medical Exemption Request, Plaintiff clearly identified and delineated Plaintiff's ADA recognized disability and Defendant's presently ongoing recognition of Plaintiff's ADA recognized disability against the mRNA COVID-19 vaccine as well as intentions to engage in the interactive accommodation process with Defendant.  *Id.*

68.    For several years throughout Plaintiff's employment at Defendant's business at no time was Plaintiff ever trained by Defendant's Human Resources Department ("HR") regarding certain requirements of Title VII, ADA, and instructed on how to identify issues concerning accommodation of religious beliefs and/or medical concerns that could arise.

69.    At or around the time of the COVID-19 Vaccination Mandate, it was known by multiple employees at Defendant's business that Defendant's HR representatives were unable to correctly answer most if not all questions posited by employees regarding the COVID-19 Policies.

70.    Defendant's HR representatives failure to correctly answer employees' questions regarding the COVID-19 Policies is believed by Plaintiff to be the result of the lack of training HR and other employees received regarding the accommodations, exemptions, and training on COVID-19 health and safety procedures.

71.    Defendant's employees who requested exemptions experienced significant hassle in doing so because of Defendant's internal procedures for handling such exemptions.

72.     Plaintiff noted there was a significant disconnect between decisions made by Defendant and its HR from the COVID-19 Vaccination Mandate announced on September 1, 2021, until Plaintiffs' termination on or about December 20, 2021.

73.     Specifically, Plaintiff believed Defendant intentionally made it difficult for Plaintiff and other Christians to practice, observe, and notify Defendant of their sincerely held religious beliefs in violation of Defendant's COVID-19 Policies and procedures.

74.     Moreover, Plaintiff believed Defendant intentionally made it difficult for Plaintiff and other individuals with recognized ADA disabilities to perform work, to file Plaintiff's Request for Medical Exemption, and engage in the accommodation processes to abstain from Defendant's COVID-19 Policies that were antithetical to the health and safety of Defendant's employees and facility.

75.     Plaintiff was required to "jump through many hoops", which unnecessarily made it difficult for him to submit his desired religious exemption and the actual submission of Plaintiff's Request for Medical Exemption without having a "target on his back" by Defendant and its managers.

76.     Defendant's prophylactic measures encumbered Plaintiff's submission of Plaintiff's Request for Medical Exemption, misrepresented and disallowed the submission of Plaintiff's desire to submit a religious exemption as well, led Plaintiff to be ostracized from Plaintiff's work team, , and resulted in Plaintiff to believe Plaintiff's medical and desired religious exemptions would not be taken seriously by those reviewing the exemptions, which in actuality had occurred.

77.      Such encumbrances undertaken by Defendant from September 2021 to December 2021 included but was not limited to the following: (i) Defendant allowed a limited number of

days for a requesting employee to submit a medical and/or religious exemption; (ii) Defendant's provision of an immense amount of vague and contradictory communications through a multitude of mediums that diminished Plaintiff's knowledge of Defendant's deadlines and requirements; and (iii) Defendant failed to provide any substantive information concerning the virus, answer any questions by requesting employees, describe the possible effects of the COVID-19 vaccination, and failed to obtain informed consent from employees who did receive the vaccine.

78.    Plaintiff was subject to the aforementioned encumbrances, which made it impossible for Plaintiff to inform Defendant of his disability, medical complications, religious beliefs and substantially more difficult for Plaintiff to inform Defendant of Plaintiff's medical complications and to have Plaintiff's medical concerns taken seriously.

79.    In Fall 2021, Defendant's COVID-19 Policies provided a higher standard of proof for an employee requesting an exemption as compared to the laxed requirements that Defendant compelled its employees to remain exempt from Defendant's COVID-19 Policies.

80.    Defendant's HR representatives who were tasked with handling the exemption requests were not trained or provided substantive guidance in religious and medical discrimination laws nor did Defendant provide its employees the option to submit both religious and medical exemptions, which is why Plaintiff only submitted Plaintiff's Request for Medical Exemption instead of Plaintiff's submission submitting both (i) Plaintiff's Request for Medical Exemption and (ii) a religious exemption request, which was desired by Plaintiff who was denied the opportunity for such.

81.    In doing so, Plaintiff was denied his constitutionally afforded rights to religious freedoms afforded under Title VII of the Civil Rights Act of 1964 ("Title VII") and subsequently

denied Plaintiff an opportunity to seek recourse for Defendant's religious discrimination and persecution of Plaintiff's religious beliefs.

82.     Plaintiff was led to believe by Defendant that Plaintiff was only able to file a religious or Request for Medical Exemption due to Defendant's HR department and Defendant's communications and representations made to Plaintiff by Defendant and Defendant's managers.

83.     Plaintiff would have filed a religious exemption because he is a devout Southern Baptist Christian and believed his religious exemption request, which would have been timely completed and submitted in good faith with accurate descriptions of his sincerely held religious beliefs would be respected by Defendant; however, Plaintiff was never allowed to file such due to Defendant's intentionally misrepresentative statements to Plaintiff regarding exemption requests.

84.     Plaintiff contends Defendant received more than 300 individual exemption requests and that every single exemption request was unilaterally denied.

85.     At no point during Plaintiff's years of employment with Defendant was Plaintiff provided written guidance, trained, and/or informed by Defendant regarding the affirmative action programs at Defendant's business to assist in discrimination prevention, Plaintiff's rights as an employee, how to prevent discrimination and retaliation, how to properly report discrimination and retaliation to Defendant's HR department, nor how to report discrimination and/or retaliation to the EEOC and/or any other applicable federal or state agency that would handle such matters.

86.     Plaintiff contends the workplace culture during the last few months of his employment became hostile towards those with ADA recognized disabilities, medical complications, and Christian religious beliefs against the mRNA vaccine.

87.     Plaintiff felt he had to "get the jab or lose his job," which was communicated in the form of daily text messages, email communications, COVID-19 propaganda throughout the

facility, through the meetings with Defendant's managers and supervisors, and by talking with employees, who would pull him aside and explicitly tell Plaintiff to not voice any opinion on the matter or be subject to reprimand for "disrupting the workplace environment."

88.     Defendant did not consider any possible alternative accommodations, such as telework, smaller work group area locations, reassignment, nor transitioning hours; however, Defendant's HR representatives unfairly indicated there were no telework positions available and no positions elsewhere in the facility where Plaintiff was able to not wear a mask and perform his job duties safely despite Plaintiff's clear ability to perform his work tasks safely in compliance with the COVID-19 Masking Policy and COVID-19 Social Distancing Policy, as well as safely with an exemption from the COVID-19 Vaccination Mandate that Plaintiff essentially had been performing the entirety of the COVID-19 pandemic safely with no complications due to his non-receipt of the mRNA COVID-19 vaccination from 2020 until just days before 2022.

89.     On October 22, 2021, Defendant denied Plaintiff's accommodation request after Defendant determined he constituted an "undue hardship" on the business because of Plaintiff's ADA recognized complication of "tinnitus" was not a valid pursuant to the ADA, which is clearly false and misrepresentative as Defendant had previously granted Plaintiff's request for medical accommodation regarding work-place accommodations one (1) year earlier in 2020 for "tinnitus" and Defendant then recognized "tinnitius" as being a serious complication recognized by the ADA.

90.     Defendant cited that Plaintiff constituted an undue hardship on the business and cited illegitimate, non-meritorious, and non-factually correct information regarding the costs associated with Defendant's accommodation of Plaintiff by severely overexaggerating the costs of accommodation.

91.    Contrary to existing federal law requirements demanding Defendant consider Plaintiff's requests for accommodation and exemptions on a case-by-case basis, Defendant instead lumped Plaintiff into existing cohort hundreds of several hundreds of individuals who had filed exemptions and Defendant never considered Plaintiff's specific accommodation requests to Plaintiff's specific designated work area, specific work title, and other specific relevant factors.

92.    Despite Plaintiff's willingness to meet, comprise, and engage in the interactive process regarding his submitted medical exemption and documentation, Defendant only contacted Plaintiff on October 22, 2021, to notify Plaintiff's Request for Medical Exemption was denied and Plaintiff could not be reasonably accommodated and only contacted again on December 20, 2021, in which Plaintiff was told Plaintiff was terminated from Defendant's business.

93.    Plaintiff wished to seek further clarification regarding Plaintiff's termination on October 25, 2021; however, Plaintiff was not provided with any substantive information as to why Plaintiff constituted an undue hardship on Defendant's business and was subjected to clearly misrepresentative statements regarding the mRNA COVID-19 vaccination and the vaccine's interplay with Defendant's previous recognition of Plaintiff's medical accommodations, which had already been sought and previously granted as well as had been in continuation during the relevant time period of Plaintiff's employment from 2020 until Fall 2021.

94.    Plaintiff contends Defendant's determination to not accommodate Plaintiff's otherwise meritorious claims for accommodations and exemption within Plaintiff's Request for Medical Exemption was the result of Defendant's premeditated and factually inaccurate characterizations of the COVID-19 virus undertaken by Defendant's senior executives that were commanded by the Government to deny all exemptions, which is what exactly occurred.

95. For instance, from September through December 2021 Defendant never: (i) met with or discussed the feasibility of accommodations with Plaintiff despite Plaintiff's willingness to do so; (ii) met with or discussed Plaintiffs' job duties, responsibilities, and day-to-day social interactions and physical proximities with any of Plaintiffs' managers or supervisors, instead only broadly concluding Plaintiff could not work in isolation; (iii) undertook a fact-specific analysis as to Plaintiff's individual economic, emotional, and/or social cost to accommodate him, (iv) provided a case-by-case analysis as to the health and safety impact of Plaintiff remaining unvaccinated and/or not wearing a mask in either of his work-offices; and (v) provided accurate COVID-19 data tracking, contract tracing, and employees statistics when considering Plaintiff's accommodation since Defendant did not possess that data and improperly relied on CDC Data Tracker that was not specifically updated and tailored for COVID-19 statistics for Madison County.

96. Instead, Defendant utilized an inflexible "one size fits all plan" and determined Plaintiff was not able to be reasonably accommodated solely because he was forced to wear a mask, socially distance, and tinnitus was not recognized by "CDC guidelines" but failed to cite these specific guidelines as none existed or presently exist to this day regarding this factor.

97. Plaintiff was able to work remotely from home, work in isolation, work in excess of six (6) feet of another, work with a facial covering, and had done so successfully from March 2020 until his termination of employment on or about December 20, 2021.

98. Defendant also violated its own COVID-19 Policies by allowing subcontractors to arrive to the facility without being subject to any of the COVID-19 Policies imposed on by Defendant's employees, like Plaintiff, which resulted in further animosity, ostracization, reprimands, and the overall degradation of the health and safety of the facility and employees.

99.    Defendant never undertook any specific actions to obtain further information about Plaintiff's' medical exemption, Plaintiff's desired religious exemption, and/or how to accommodate his ADA recognized disability and purported sincerely held religious beliefs.

100.    Rather, Defendant's HR representatives made internal decisions based on subjective factors that were evident in closed-meeting PowerPoint presentations that identified an excessively restrictive exemption policy.

101.    Plaintiff contends that the basis of these "do-not record" presentations and meetings by Defendant's managers indicated Defendant's primary consideration in determining exemption requests was Plaintiffs' and others exemption requesting employees' effect on Defendant's profits, Defendant's ability to obtain COVID-19 funding and relief from Government, and Defendant's ability to retain present and obtain future Government contracts.

102.    From January 2020 until Plaintiff's termination on or about December 2021, Defendant had not seriously taken into consideration the health and safety of its employees and facility as Defendant's COVID-19 Policies were ineffective, unreliable, and misrepresentative.

103.    Accommodation of Plaintiff in December 2021 would not have financially imparted a burden on Defendant.  First, Defendant received several millions of dollars in the form of COVID-19 relief funding that was provided by state and federal governments, primarily from The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which were provided to individuals and business entities to alleviate concerns and impacts associated with COVID-19. Second, Plaintiff was able and willing to provide his own COVID-19 test kits that he was able to obtain for free from the White House.  Third, Plaintiff was willing and able to wear gloves, facial protection, socially distance, perform work behind plexiglass barriers, and discuss other accommodations to avoid termination from Defendant's business.

104.    Defendant's termination of Plaintiff was forty-seven (47) days before EO 14042 was to become effective and Defendant's conduct occurred solely due to the Government's commandment and encouragement for the entity to follow EO 14042, which Defendant did and relied upon in making the decision to terminate Plaintiff.

105.    On December 9, 2021, Defendant abandoned Defendant's creation, implementation, and enforcement of Defendant's COVID-19 Vaccination Mandate only one (1) month after Defendant's termination of Plaintiff.

106.    From September 2021 until December 2021, Defendant and its managers overseeing the COVID-19 Policies creation, implementation, administration, and enforcement were relying on incorrect and/or misrepresentative statistics to justify these policies.

107.    For instance, Plaintiffs' managers would make claims that employees could abandon Defendant's COVID-19 Mask Mandate if the CDC statistics regarding the daily cases in the region decreased; however, COVID-19 case counts were the lowest they had ever been during the pandemic in November 2021 and even when case counts dropped there was no change in policies.  Another example is Defendant's HR representatives, such as Liz Johnson, who justified the termination of Plaintiff and other employees on meritless grounds that were disproven by the CDC concerning the virus' transmission.

108.    Such as Defendant's managers, HR representatives, and Morgan County improperly communicated over-generalized and misrepresentative blanket statements regarding the COVID-19 virus and COVID-19 Policies, such as "that masking is a proven way to significantly reduce the threat of the transmission of COVID-19."

109.    However, an individual's mask, vaccination status, and even anti-bacterial disinfectant utilized by that individual has no bearing on whether that individual is a host of the

virus, transmits the virus, and/or receives the virus from another individual or surface because COVID-19 is a virus pathogen as opposed to a bacterium.

110.    At the time of Plaintiff's termination, COVID-19 cases across the U.S., Alabama, and Madison County were some of the lowest figures reported since the onset of the pandemic. On November 15, 2021, the seven (7) day average per cases for the U.S. was reported as 94,892, the state of Alabama reported 481, and Madison County reported four (4) daily cases.

111.    Every employee at Defendant's facilities, whether vaccinated or unvaccinated, had been working side by side for virtually two (2) years during the COVID-19 pandemic before Defendant's enactment of its COVID-19 Vaccine Mandate without incident, without raising of any health and safety concerns, and without ostracization of an employee based upon an enumerated characteristic of disability or religious belief.

### D.    Defendant's Pandemic Response

112.    While the U.S. in 2020 and into 2021 was battling COVID-19 and the national shutdown, Defendant's facilities remained open as they were classified as an "essential business" and employees were given specific exemption slips that served as documentation of such provided by Defendant, which was signed and authorized by the Government.

113.    At no time since the start of the pandemic in did Defendant shutdown, halt production, and/or reduce its workforce until Defendant's COVID-19 Vaccination Mandate's implementation in November 2021.

114.    Defendant undertook little efforts to combat the virus and promote the health and safety of its employees for all of 2020, 2021, and 2022.

115.    In fact, Defendant's only health and safety efforts required employees to: (1) wash their hands; (2) stay home if sick; (3) wear facial protection; and (4) socially distance when possible.

116.    Through multiple manners and means, such as in-writing through communications and medical exemption requests and through oral statements to Defendant's HR representatives and managers, Plaintiff expressed his willingness to continue these practices and engage in more hygienic practices so long as Plaintiff was able to keep his job in accordance with Plaintiff's disability, medical capabilities, and sincerely held religious beliefs; however, these pleas were denied and were never considered in Defendant's unjust and hastily done decision to deny Plaintiff's medical exemption request, deny accommodations, and terminate Plaintiff.

117.    Throughout all of 2020 and virtually all of 2021, Defendant had only employed less than five (5) cleaning staff members to ensure all of Defendant's facilities were sufficiently disinfected to help minimize infection rates and reduce transmission.

118.    Plaintiff and other employees would frequently find these members of the cleaning staff in the bathrooms on their phones, minimally cleaning anything in or around the facility, and almost never see cleaning personnel wiping down tables, door handles, or anything with a high rate of human contact among any of Defendant's facilities with disinfectant.

119.    Defendant had implemented a policy concerning an individual employee who contracted the COVID-19 virus to stay home for at minimum ten (10) day isolation period and that the "cleaning" department would clean the affected areas; however, Plaintiff nor his colleagues ever witnessed the affected area and/or work stations of those individuals who contracted COVID-19 to be deep cleaned and/or even addressed by any manager or cleaning department member ever.

120.    At no point from January 2020 until Plaintiffs' termination did Defendant offer COVID-19 testing on-site, COVID-19 vaccinations on-site, nor did Defendant provide adequate access to hygienic materials nor personal protection equipment ("PPE"), beyond an occasional mask, to protect Plaintiff from the virus.

121.    During this same timeframe from January 2020 until December 2021, the facilities were in a constant state neither healthy nor sanitary due to a lack of anti-bacterial soap, anti-bacterial alcohol-based hand sanitizer, used trash, sharp jagged objects, and broken bathroom equipment that was in consistently dilapidated state leading to further transmission and spread of the COVID-19 virus, which jeopardized the health and safety of Plaintiff and other employees.

122.    Defendant never installed a ventilation system, repaired its ventilation system, and/or took any similar actions at its facilities before and/or during the pandemic, which would provide adequate air flow that would lessen the capability of the COVID-19 virus or any infectious diseases from spreading.

123.    At no point during the pandemic from January 2020 until Plaintiffs' termination did Defendant offer COVID-19 testing on-site, COVID-19 vaccinations on-site, nor offer provision of any PPE that would assist in combatting the virus.

124.    Defendant's decision and subsequently conduct to create, enact, implement, administer, and enforce its COVID-19 Policies imposed an unreasonable condition upon Plaintiff's terms of employment that was unforeseeable by Defendant and Plaintiff.

125.    In specific, Defendant's officers and manager's decision and subsequent actions regarding its COVID-19 Policies were unreasonable due to Defendant's conduct to compel Plaintiff, who adamantly opposed Defendant's COVID-19 Policies, to undertake an experimental and unproven mRNA medical procedure that would have biologically altered Plaintiff's genetic

makeup within a condensed timeframe and implement such as a condition of sustained employment.

126.    Defendant's coercive conduct to force Plaintiff abandon his sincerely held religious beliefs and place Plaintiff at direct harm by forcing Plaintiff to receive an untested-experimental mRNA vaccine that would ultimately harm Plaintiff's physical, mental, and spiritual health at the expense of his career and ability to provide for his family is an unconscionable "threat" and not "choice", which was imparted upon Plaintiff during his employment from January 2020 until December 2021.

### E.    Plaintiff's Employment at Defendant's Business

127.    During Plaintiffs' term of employment, Plaintiff was a dedicated, hardworking, and loyal employee who performed his job duties diligently and only furthered Defendant's business.

128.    Plaintiff is a devout Southern Baptist Christian who hold sincerely held religious beliefs against the creation and use of the mRNA COVID-19 vaccination due to aborted stem cells and the unreasonable invasion into his personal autonomy.

129.    Plaintiff notified Defendant of Plaintiff's Christian beliefs through oral conversations with Plaintiff's managers done from September 2021 until December 2021.

130.    Plaintiff notified Defendant of Plaintiff's ADA disability complications upon his submission of Plaintiff's first medical exemption and accommodation request for "tinnitus" on or about the submission in 2019.

131.    Plaintiff notified Defendant of Plaintiff's ADA disability complications upon his submission of Plaintiff's Medical Exemption Request on September 22, 2021, to Defendant's HR department.

28

132.    Plaintiff had contracted the COVID-19 virus multiple times, including the original variant and Delta variant of the virus, from 2020 and again in 2021, and possessed requisite antibodies to remain completely inoculated and immune from the COVID-19 virus; however, despite this fact, Defendant's COVID-19 Policies did not consider this important factor nor was this fact ever included and/or considered by Defendant in Defendant's decision to deny Plaintiff's Medical Exemption Request, deny reasonable accommodations, and terminate Plaintiff unlawfully and with no justification worthy of credence to take such actions against Plaintiff.

133.    Plaintiff performed his job duties and responsibilities as an aerospace technician Decatur offices and manufacturing facilities.

134.    Plaintiff's physical place of employment was located at Defendant's facilities and campus located in Decatur, Alabama, where given the absolute magnitude size of Defendant's facilities due to the nature of Defendant's specialization business as a defense contractor with the Government, Defendant's facilities were so large and were minimally staffed and could accommodate large numbers of people and can spread multiple persons across physical space in excess of six (6) feet, which was the applicable standard and undertaken for nearly two (2) years during the  COVID-19 pandemic.

135.    For nearly fourteen (14) years and even during the two (2) years of the COVID-19 pandemic prior to Plaintiff's respective termination, Defendant employed Plaintiff to exclusively work within its large office and/or manufacturing facilities, which feature nearly one (1) million square feet manufacturing floor space and among multiple offices, facilities, and building like structures where only limited amount of personnel worked to perform their functions and could do so safely given the immense size of the facilities that Plaintiff was performing tasks.

136. Plaintiff was able to successfully perform his work related tasks, duties, and responsibilities in a health and safe manner with little to no managerial oversight in-person, minimal need to be in direct physical involvement with another individual, and was able to socially distance in excess of six (6) feet while wearing a facial cloth to avoid exposure to COVID-19 and Plaintiff successfully did so for nearly two (2) whole years of the COVID-19 pandemic and all of Defendant's COVID-19 Policies, with the lone exception of the COVID-19 Vaccination Mandate.

137. In an effort to reduce the spread and contraction of the COVID-19 virus to further Defendant's objectives of health and safety, Plaintiff routinely cleaned and sanitized himself, Plaintiff's personal effects, as well as Plaintiff's personal workspace.

138. On rare occasions, Plaintiff performed work-related tasks, special assignments, and meetings in office-like structures adjacent to the manufacturing facility Plaintiff predominantly performed his work related tasks.

139. The Decatur, Alabama, office and facilities were of sufficient size and contained numerous unused, private offices/rooms to safely practice social distancing from other people.

140. The Decatur, Alabama, office and facilities possessed containment areas solidified by doors, allowed an individual to safely remove their mask due to the excess of physical space from other employees; in fact, these rooms were so safe that even during seasons when full-time, in-office masking was mandated for all employees, even though no religious or medical exemptions were offered, managers and supervisors who had the luxury to occupy these private offices were frequently observed to be unashamedly maskless and often made jesting and ridicule filled remarks at others, like Plaintiff, who were compliant with the commandments imposed by Defendant's COVID-19 Policies.

141. Throughout all of 2020 and 2021, Plaintiff and other unvaccinated employees were able to perform their tasks safely, responsibly, and effectively within Defendant's large facilities both in-person and remotely.

142. Throughout all of 2020 and 2021, Plaintiff was never formally admonished in any manner for an alleged violation of any of the COVID-19 Policies concerning the health and safety of the facility and employees nor was Plaintiff ever formally reprimanded for poor work performance while working.

143. Up until his termination, Plaintiff would drive his vehicle to and from Defendant's immense parking lot to Plaintiff's home with limited to virtually no social interaction, which resulted in the ultimate minimization of the spread of the COVID-19 virus.

144. For nearly two (2) years of the pandemic, Plaintiff would rarely come into physical contact and/or close physical proximity to another individual during this time when he was on campus and would arrive minutes before 5:00 AM when there was little to no other employees physically around in the area, and Plaintiff never carpooled to further minimize the spread.

145. When Plaintiff was required to work from the Decatur facility during this time period, Plaintiff would approach the gate with Plaintiff's large truck, swiped Plaintiff's security badge, and the security guard would contactless allow Plaintiff to pass through the security checkpoint without physical interaction and in compliance through applicable social distancing and masking commandments because Plaintiff's large truck and distance from the security guard further provided limited contact and spread of the COVID-19 virus while arriving to and from work.

146. During Plaintiff's employment up until Plaintiff's termination on or about December 20, 2021, Plaintiff was a team member of a work team and worked with at most five (5)

31

persons on his work team who were socially distanced, wearing facial protections, and complied with hybrid remote-work schedules.

147. For months up until his termination, Plaintiff performed his job duties in a windowless office-within-an-office. No natural light was immediately available as there were frosted windows at the top of the walls. Offices surrounding the office-within-an-office, all along the perimeter of the building, were provided with ample natural light from immediate and/or adjacent windows.

148. Throughout the pandemic, up to Plaintiff's termination, and beyond, Defendant expressed a preferential policy to only hire individuals on the basis of their vaccination status and refused to consider any religious and/or medical exemptions to the COVID-19 vaccination.

149. In specific, throughout 2021 to present, Defendant exhibits a policy to promote, affirm, and/or publicly congratulate those employees who chose to be vaccinated, which is evident by their social media posts and allowance of similarly situated employees who were vaccinated to work remotely, while Plaintiff was stripped of his job responsibilities, dignity, and subsequently terminated.

150. From the start of the pandemic until December 2021, Defendant's managers arbitrarily applied health and safety principles regarding spacing, physical touching of selves and others, testing, and masking requirements, which led to these policies and practices to not apply to vaccinated persons and specifically targeted only those who had asserted disability rights, medical complications, and religious beliefs in Fall 2021 in response to Defendant's COVID-19 Vaccination Mandate.

151.    Not only was Plaintiff directly impacted due to Defendant's harm and intrusive conduct that was antithetical to Defendant's purported objectives and commitment to "health and safety", but Plaintiff's family was also directly impacted by Defendant's actions.

152.    Specifically, in Fall 2021 the words and actions of management led Plaintiff to believe his employment would be terminated by making the choice to not get vaccinated, which led to a feeling of being coerced into choosing his career over Plaintiff's ADA recognized disability and religious beliefs.

153.    The stress of this negatively impacted Plaintiff's emotional, physical, spiritual, and mental state; in turn, this spiritual and emotional decline led to fear and anxiety in those closest to Plaintiff, which included but was not limited to Plaintiff's immediate family and friends and added further complications to Plaintiff's relationship with Plaintiff's significant other.

154.    Due to Defendant's daily production of unsolicited email and text correspondences with COVID-19 propaganda before and after work hours, Plaintiff and his family members were negatively impacted by the consistent and pervasive "threats" sent to Plaintiff by Defendant.

155.    From September 2021 until Plaintiff's termination on or about December 20, 2021, Plaintiff would be asked intrusive questions about Plaintiff's protected health information and medical procedures from many of Defendant's employees who had no need for the information, were not adequately trained to obtain the information, were not adequately trained on protecting the information, and did not have the information readily available upon request.

156.    Furthermore, Defendant's managers failed to safeguard Plaintiff's and others' confidential medical information because Defendant's managers had compiled a comprehensive report of who was unvaccinated and vaccinated and freely disseminated this information to those without Plaintiff's consent and knowledge.

157.    Throughout September and December 2021, Defendant obtained, organized, disseminated, Plaintiff and others sensitive confidential and personal information, such as vaccination status, and to provide the obtained information in a readily available excel spreadsheet for Defendant's use and collection regarding its COVID-19 Policies.

158.    Throughout Fall 2021 until Plaintiffs' termination, Defendant's vaccinated workforce was collecting confidential medical information of their employees, disseminating the obtained information to multiple other employees without Plaintiffs' consent or knowledge, and for those unvaccinated employees who were identified as dissenters.

159.    Defendant's actions defamed Plaintiffs' reputation in the community on the basis of their religion due to Defendant's failure to adequately safeguard Plaintiff's protected health information, confidential health information, and/or confidential personal information.

160.    From September 2021 until termination on or about December 20, 2021, Plaintiff felt Defendant was monitoring his private technological data or communications to identify who remained unvaccinated so Defendant could bring him into compliance with Defendant's COVID-19 Vaccination Mandate through punitive actions.

161.    Plaintiff felt Defendant's managers eavesdropped on his conversations, surveilled him for weeks, and accessed and/or monitored his private information as well as negligently left Plaintiff's private information and other confidential medical information out in the open through documentation and through unsecured technological devices, such as unlocked and non-password protected computers, which led to further discrimination, harassment, and prejudice sustained by Plaintiff during Plaintiff's employment at Defendant's business.

162.    Plaintiff felt Defendant's COVID-19 Vaccination Mandate, COVID-19 Masking Policy, COVID-19 Social Distancing Policy, and COVID-19 Testing Policy, taken in conjunction,

were all unreasonably discriminatory, harassing in nature, intended to inhibit his practicing of Christian beliefs, intended to forgo his Christian beliefs, ADA recognized disability, and medical complications at the expense of his career, and unnecessarily intruded into his personal life away from his job duties at Defendant's business.

163.    Plaintiff contends the following to support his contentions regarding Defendant's COVID-19 Policies that were imposed on Plaintiff throughout January 2020 until Plaintiff's termination on or about December 20, 2021:

(i) the frequency of the required COVID-19 medical tests; (ii) the medical tests and masking policies tests were physically intrusive and degrading to Plaintiff; (iii) the time taken to engage in each medical test would intrude on personal and family time of Plaintiff; (iv) the financial implications on its workforce because Plaintiff was not compensated for the time taken for each medical test as they were instructed to clock-out with their respective supervisor and Plaintiff had to provide his own masks; (v) the medical tests and masking policies did not further their purported goals and went on long after it was clear the COVID-19 vaccinations did not prevent infection or transmission; (vi) coerced submission to a regime of Government mandated medical testing has a severe emotional and mental impact on Plaintiff; (vii) the medical tests and masking policies would only be administered to Plaintiff and other unvaccinated Christians despite the fact the virus does not discriminate on religious grounds; (viii) Plaintiff were isolated and ostracized from the majority of their peers to be subject to this unreasonable testing, social distancing, and masking requirement while Defendant's vaccinated workforce was not subject to these policies and possessed the same possibility and/or likelihood to transmit and contract the virus; (ix) Defendant's actions to compel its employees to undergo a medical procedure without providing informed consent to the effects of the medical procedure infringes on Plaintiff's fundamental rights to personal autonomy, bodily integrity, and right to refuse medical treatment; (x) the medical testing and masking policies did not consider the physical and mental effects of prolonged testing on its workforce in terms of the impacts on the throat and/or nose of the individual; (xi) the medical tests and masking policies did not consider the incubation period of COVID-19 nor the impacts of compelling Plaintiff and others to repeatedly have to be subjected to additional testing due to false positives and/or bad batches of COVID-19 tests; (xii) the medical testing and masking policies did not consider the effects of having a multitude of persons within a confined space, within six (6) feet, without masks at times, who are all testing for COVID-19, which has the strong potential to lead to mass infection of those who were present in that area at a given time and lead to subsequent transmission over the course of several hours infecting new individuals that arrive for testing and thereby lead to those individuals transmitting the virus to their

families when each individual returned home; (xiii) Defendant never considered the effects of natural immunity and publicized within its COVID-19 safety grams to employees that an employees' demonstration of natural immunity and/or similar status would not allow its employees to receive any exemption; and (xiv) the collection, dissemination, reporting, surveillance, and/or other actions taken to disseminate, generate, and identify facility data, reports, and/or statistics of unvaccinated employees' confidential information, which Defendant had failed to adequately safeguard from the public and its employees.

164.    Defendant's COVID-19 Vaccination Mandate, COVID-19 Masking Policy, COVID-19 Social Distancing Policy, and COVID-19 Testing Policy were outdated, ill-informed, breeding grounds for the virus, led to frequent harassment and discrimination against Plaintiff's religious beliefs, and unreasonably intruded upon Plaintiff's privacy and solitude.

165.    During the time of Defendant's COVID-19 Policies throughout November 2021 until December 2021, Plaintiff felt anxious, saddened, and fearful.

166.    Plaintiff interpreted Defendant's conduct during this time period as "anatomical rape" due to the pervasive tactics to have Plaintiff forgo his religious beliefs and submit to "a coerced medical procedure that is in direct violation of his religious beliefs, ADA recognized disability, and medical capabilities."

167.    Based upon Defendant's actions and representations to Plaintiff and employees, Defendant did not care about the negative health effects of any of the unproven mRNA vaccinations, which would alter the biological aspects of Plaintiff and exacerbate Plaintiff's existing medical conditions, did not provide and/or achieve informed consent of employees who were forced to comply with the COVID-19 Vaccination Mandate, and would undertake in actions to not remain liable for its harassing, discriminatory, and prejudicial conduct unnecessarily imposed on Defendant's employees.

168.    Plaintiff contends he was targeted on the basis of his religious faith as a Christian and ADA disability status, and that because of these characteristics Plaintiff was subjected to

Defendant's pervasive intrusions and harassing actions to ensure compliance of its COVID-19 Vaccination Mandate, COVID-19 Testing Policy, COVID-19 Masking Policy, and COVID-19 Social Distancing Policy.

169.    Plaintiff did not pose a direct threat to the health and safety of the facility and employees; rather, Plaintiff believes he posed a direct threat to Defendant's receipt of COVID-19 relief funds, Defendant's receipt of millions of present and future Government contracts, and whose conduct to create, enact, implement, and enforce the COVID-19 Vaccination Mandate was directly attributable to U.S. and state Government's increased pressure on Defendant to enact such a vaccination policy due to EO 14042 and through explicit encouragement and at the direction of multiple Government officials for the DOD, U.S. Space Force, and NASA, which are the primary determinative reasons as to why Defendant undertook numerous adverse employment actions that are causally attributable to Defendant's adverse employment actions taken by Defendant against Plaintiff after Plaintiff's good faith actions to engage in protected activities recognized by federal and state law.

## VI.    CAUSES OF ACTION

### –  COUNT I  –
### VIOLATION OF THE ADA, 42 U.S.C § 12101E, *ET SEQ.*
### DISABILITY DISCRIMINATION – THEORY OF FAILURE TO ACCOMMODATE

170.    The named Plaintiff re-alleges and incorporates by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

171.    The ADA prohibits Defendant from discriminating against its employees on the basis of their sincerely held religious beliefs.

172.    The named Plaintiff holds sincere religious beliefs that preclude him from receiving the mRNA COVID-19 vaccine.

173.    In good faith, the named Plaintiff informed Defendant of the medical complications and disabilities and requested reasonable accommodations from Defendant's COVID-19 Vaccination Mandate.

174.    The named Plaintiff undertook all requisite and applicable procedures to engage in the accommodation process with Defendant.

175.    Defendant's conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment of the named Plaintiff.

176.    Defendant has failed to engage in the interactive process with the named Plaintiffs regarding the requests for accommodations.

177.    Irrespective of the interactive process, Defendant failed to grant the named Plaintiff's valid religious exemption request and provide reasonable accommodations, thereby discriminating against the named Plaintiffs because of their religious beliefs.

178.    Through Defendant's actions, policies, employment practices, and conduct directed at Plaintiff's religious faith in addition to failing to engage in the interactive process or offer any accommodations, Defendant intentionally and/or recklessly deprived the named Plaintiff of his constitutional rights to protection under law in violation of Title VII.

179.    As a result of the actions of Defendant, the named Plaintiff has been and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

– **COUNT II** –
**VIOLATION OF THE ADA, 42 U.S.C § 12203, *ET SEQ*.**
**DISABILITY RETALIATION**

180.    The named Plaintiff re-alleges and incorporates by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

181.    The ADA prohibits Defendant from retaliating against its employees on the basis of their medical disabilities.

182.    The named Plaintiff suffers from an ADA recognized disability, which precludes Plaintiff from receiving the mRNA COVID-19 vaccine.

183.    In good faith, the named Plaintiff engaged in the protected activity to inform Defendant of the medical complications he suffers from, clearly identified his disability, and requested reasonable accommodations from Defendant's COVID-19 Vaccination Mandate.

184.    The named Plaintiff undertook all requisite and applicable procedures to engage in the ADA protected activity to seek reasonable accommodations for the disability and to engage in the accommodation process with Defendant regarding abstention from the COVID-19 vaccine.

185.    Defendant's conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment of the named Plaintiff.

186.    After Plaintiff engaged in the protected activity in seeking reasonable accommodations for his ADA recognized disability, Defendant undertook adverse employment action against Plaintiff by Defendant's failure to engage in the interactive process with the named Plaintiffs regarding the requests for accommodations and terminated Plaintiff.

187.    Irrespective of the interactive process, Defendant failed to grant the named valid Plaintiff's Medical Exemption Request and provide reasonable accommodations, thereby discriminating against the named Plaintiff because of Plaintiff's medical capabilities and disability.

188.    Through Defendant's actions, policies, employment practices, and conduct directed at Plaintiff and Plaintiff's disability addition to failing to engage in the interactive process and/or offer any accommodations, Defendant intentionally and/or recklessly deprived the named Plaintiff of his constitutional rights to protection afforded under the law in violation of ADA.

189.    A distinctive causal connection exists between Defendant's adverse actions that were undertaken immediately after Plaintiff's engagement and participation in good faith to seek accommodation for Plaintiff's ADA recognized disability through the submission of Plaintiff's Medical Exemption Request.

190.    As a result of the actions of Defendant, the named Plaintiff has been and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

**– COUNT III –**
**VIOLATION OF SECTION 504 REHABILITATION ACT OF 1973, 29 U.S.C. § 794 *ET SEQ.***
**DISABILITY DISCRIMINATION**

191.    The named Plaintiffs allege and incorporate by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

192.    Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794 *et seq.*, prohibits recipients of federal financial assistance from discriminating against qualified individuals with disabilities in employment opportunities, programs, activities.

193.    Defendant is defined as a federal contractor that is presently or was previously receiving federal compensation in the form of financial assistance or government grants.

194.    The named Plaintiffs are disabled individuals within the meaning of Section 504 of the Rehabilitation Act of 1973.  The named Plaintiffs suffered mistreatment and discrimination on the basis of this protected characteristic.  The named Plaintiffs were otherwise qualified to perform their duties as demanded by their employment.

195.    Defendant's conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment of the named Plaintiffs.

196.    The named Plaintiffs were exclusively denied employment opportunities and subject to harassing and discriminatory conduct on the basis of their disability.

197.    The named Plaintiffs were employed at Defendant's facilities and were performing job task, duties, and/or responsibilities to Defendant projects, contracts, and/or developments that were subject to federal financial assistance.

198.    The actions of Defendant, as previously set out and contained herein, violate Section 504 of the Rehabilitation Act of 1973.

199.    As a result of the discriminatory actions of Defendant, the named Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

### – COUNT IV –
#### VIOLATION OF FIRST AMENDMENT OF U.S. CONSTITUTION, U.S. CONST. AMEND. I FREE EXERCISE OF RELIGION CLAUSE – DUTY DISQUALIFICATION

200.    The named Plaintiff re-alleges and incorporate by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

201.    The First Amendment's Free Exercise Clause prohibits the government or a private actor operating under the color of law from enacting non-neutral and non-generally applicable laws or policies unless they are narrowly tailored to a compelling government interest.

202.    The original public meaning of the Free Exercise Clause is the Government may not burden a sincerely held religious belief unless the Government can demonstrate a compelling interest and that the law or policy burdening religious exercise is the least restrictive means to achieve that compelling interest.

203.    Defendant's intentional conduct to create, implement, administer, and enforce its COVID-19 Policies qualify as state action due to the Government's compulsion and direction.

204.    The named Plaintiff engaged in protected activity when he requested and submitted his religious exemption request from Defendant's COVID-19 Policies.

205.    Defendant responded to Plaintiff's protected activity by giving the employees the unconscionable decision to abandon their religious beliefs or face effective termination.

206.    Defendant's COVID-19 Policies substantially burden Plaintiff's sincerely held religious beliefs by requiring him to take actions, such as receipt of the mRNA COVID-19 vaccine, intrusive masking, and intrusive testing, which would violate Plaintiff's religious beliefs and Plaintiff would suffer severe adverse employment actions and financial injury. Defendant's COVID-19 Policies, when taken together, substantially burden the named Plaintiff's sincerely held religious beliefs at the expense of his career and livelihood.

207.    Defendant's COVID-19 Policies are not the least restrictive means of accomplishing the Government's purported interest and Defendant possessed multiple lesser restrictive methods of mitigating the spread of the virus.

208.    Accordingly, Defendant's COVID-19 Policies violate Plaintiff's rights to the free exercise of religion under the First Amendment.

209.    As a result of the actions of Defendant, the named Plaintiff has been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

– COUNT V –
VIOLATION OF RELIGIOUS FREEDOM RESTORATION ACT OF 1993, 42 U.S.C § 2000bb *ET SEQ*.
RELIGIOUS DISCRIMINATION – DUTY DISQUALIFICATION

210.    The named Plaintiff re-alleges and incorporate by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

211.    The Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb *et seq.*, states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1.

42

212.    The act broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (citing 42 U.S.C. § 2000cc-5(7)(A)).

213.    RFRA imposes strict scrutiny on all actions of the federal government that "substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(b).

214.    Unless the government satisfies the compelling interest test by "demonstrat[ing] that [the] application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," 42 U.S.C. § 2000bb-1(b), the governmental act violates RFRA.

215.    Defendant's intentional conduct to create, implement, administer, and enforce its COVID-19 Policies qualify as state action due to the Government's compulsion and direction.

216.    The named Plaintiff engaged in protected activity when he requested and submitted his religious exemption request from Defendant's COVID-19 Policies.  Defendant responded to Plaintiff's protected activity by giving the employees the unconscionable decision to abandon their religious beliefs or face effective termination.

217.    Defendant's COVID-19 Policies substantially burden Plaintiff's sincerely held religious beliefs by requiring him to take actions, such as receipt of the mRNA COVID-19 vaccine, intrusive masking, and intrusive testing, which would violate Plaintiff's religious beliefs and Plaintiff would suffer severe adverse employment actions and financial injury.

218.    Defendant's COVID-19 Policies are not the least restrictive means of accomplishing the Government's purported interest and Defendant possessed multiple lesser restrictive methods of mitigating the spread of the virus.

219.    Accordingly, Defendant's COVID-19 Vaccination Mandate and related policies violate Plaintiff's rights under RFRA.

220.    As a result of the actions of Defendant, Plaintiff has been and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

## – COUNT VI –
### DEPRIVATION OF CIVIL RIGHTS & LIBERTIES UNDER § 1983, 42 U.S.C § 1983
### 14TH AMENDMENT SUBSTANTIVE DUE PROCESS – FUNDAMENTAL RIGHT TO PRIVACY: REFUSAL OF MEDICAL PROCEDURES

221.    The named Plaintiff re-alleges and incorporate by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

222.    The Supreme Court has recognized guaranteed "zones of privacy" under the U.S. Constitution.  *See Roe v. Wade*, 410 U.S. 113 (1973).  Various privacy rights have been deemed fundamental in nature, such as an individual's fundamental right to privacy with respect to refusing medical procedures that are unwanted.

223.    Defendant's intentional conduct to create, implement, administer, and enforce its COVID-19 Policies qualify as state action due to the Government's compulsion and direction.

224.    In filing of his religious exemption and accommodation request to Defendant in opposition of Defendant's COVID-19 Vaccination Mandate, Plaintiff asserted his fundamental liberty interest to not be compelled to undergo unwanted medical procedures, such as receipt of an injection of an mRNA COVID-19 vaccination.

225.    Defendant's COVID-19 Vaccine Mandates are not a neutral and generally applicable law or policy. Defendant's Vaccine Mandates fail strict scrutiny. Defendant does not have a compelling government interest in requiring Plaintiff to violate his sincerely held religious beliefs by taking an mRNA COVID-19 vaccine.

226.    Defendant's COVID-19 Policies are not the least restrictive means of accomplishing the Government's purported interest and Defendant possessed multiple lesser restrictive methods of mitigating the spread of the virus.

227.    Plaintiff has already suffered and continues to suffer the consequences of Defendant's adverse employment actions and is afforded protection his constitutionally afforded right to privacy.

228.    As a result of the actions of Defendant, the named Plaintiff has been and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

– **COUNT VII** –
**DEPRIVATION OF CIVIL RIGHTS & LIBERTIES UNDER § 1983, 42 U.S.C § 1983
14TH AMENDMENT SUBSTANTIVE DUE PROCESS – FUNDAMENTAL RIGHT TO PRIVACY: AVOID
DISCLOSURE OF PERSONAL MEDICAL INFORMATION**

229.    The named Plaintiff re-alleges and incorporate by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

230.    The Supreme Court has recognized guaranteed "zones of privacy" under the U.S. Constitution. *See Roe v. Wade*, 410 U.S. 113 (1973). Various privacy rights have been deemed fundamental in nature, such as an individual's fundamental right to privacy with respect to disclosure of personal medical information.

231.    Defendant's intentional conduct to create, implement, administer, and enforce its COVID-19 Policies qualify as state action due to the Government's compulsion and direction.

232.    In filing of his religious exemption and accommodation request to Defendant in opposition of Defendant's COVID-19 Vaccination Mandate, Plaintiff asserted his fundamental liberty interest to not be compelled to undergo unwanted medical procedures, such as receipt of an injection of an mRNA COVID-19 vaccination.

45

233.    Plaintiff's private medical information was disseminated to a multitude of individual employees at Defendant who had full access to Plaintiff's confidential medical information, which was obtained without Plaintiff's knowledge or consent.

234.    Defendant weaponized Plaintiff's private medical information to coerce Plaintiff to forgo his sincerely held religious beliefs and subject himself to an unwanted medical procedure.

235.    Defendant's COVID-19 Policies are not a neutral and generally applicable law or policy. Defendant's Policies fail strict scrutiny. Defendant does not have a compelling government interest in requiring Plaintiff to violate his sincerely held religious beliefs by taking an mRNA COVID-19 vaccine.

236.    Defendant's COVID-19 Policies are not the least restrictive means of accomplishing the Government's purported interest and Defendant possessed multiple lesser restrictive methods of mitigating the spread of the virus.

237.    Plaintiff has already suffered and continues to suffer the consequences of Defendant's adverse employment actions and is afforded protection his constitutionally afforded right to privacy.

238.    As a result of the actions of Defendant, the named Plaintiff has been and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

### – COUNT VIII –
**DEPRIVATION OF CIVIL RIGHTS & LIBERTIES UNDER § 1983, 42 U.S.C § 1983**
**14TH AMENDMENT DUE PROCESS CLAUSE – FREEDOM OF RELIGION**

239.    The named Plaintiff re-alleges and incorporate by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

240.    Defendant's intentional conduct to create, implement, administer, and enforce its COVID-19 Policies qualify as state action due to the Government's compulsion and direction.

241. The named Plaintiff engaged in protected activity when he requested and submitted his religious exemption request from Defendant's COVID-19 Policies. Defendant responded to Plaintiff's protected activity by giving the employees the unconscionable decision to abandon their religious beliefs or face effective termination.

242. Defendant's COVID-19 Policies substantially burden Plaintiff's sincerely held religious beliefs by requiring him to take actions, such as receipt of the mRNA COVID-19 vaccine, intrusive masking, and intrusive testing, which would violate Plaintiff's religious beliefs and Plaintiff would suffer severe adverse employment actions and financial injury. Accordingly, Defendant's COVID-19 Policies violate Plaintiff's rights to religious freedom under the Fourteenth Amendment's due process clause.

243. As a result of the actions of Defendant, the named Plaintiff has been and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

## – COUNT IX –
### VIOLATION OF ALABAMA STATE LAW
### NEGLIGENCE AND/OR GROSS NEGLIGENCE

244. The named Plaintiff re-alleges and incorporate by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

245. Defendant failed to perform their duty by and through either simple or gross negligence in deprivation of the constitutional rights of the named Plaintiff.

246. Defendant had a duty to not violate the privacy of their employees by compelling a medical procedure of an experimental vaccine and releasing and/or identifying their employees' medical preferences to other employees and the public.

247. Defendant had a duty to maintain reasonable and proper control of their managers.

248. Defendant had a duty to ensure the health and safety of its employees in the workplace was not comprised.

249. Defendant had a duty to safeguard its employee's personal health information, protected health information, confidential information, and personally identifiable information.

250. Defendant breached its respective duties to the named Plaintiff, which has caused both compensatory and consequential damages directly relating to Defendant's negligence and/or gross negligence.

251. But for Defendant's breach of its respective duties, Plaintiff would not have suffered the damages to be set forth at trial.

252. All other acts of negligence, which were the cause of the damage to the named Plaintiff that will be shown at the trial of this matter.

253. Defendant is liable for any and all damages to the named Plaintiff arising out of the subjection negligence in amounts to be shown at the trial of this matter.

254. As a result of Defendant's actions, the named Plaintiff has been and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

– **COUNT X** –
**VIOLATION OF ALABAMA STATE LAW**
**INVASION OF PRIVACY – INTRUSION & SECLUSION THEORY**

255. The named Plaintiff re-alleges and incorporate by reference paragraphs 1–169above with the same force and effects as if fully set out in specific detail hereinbelow.

256. The named Plaintiff's private medical information at Defendant's businesses pertaining to confidential medical information, such as their vaccination status, medical complications, and general medical information, were repeatedly disclosed publicly through a multitude of mediums that was permitted, endorsed, and/or permitted by Defendant.

257.    Defendant's actions infringed upon the intrusion upon seclusion theory based upon their wrongful intrusion into Plaintiff's private activities in such a manner that it caused severe outrage, mental suffering, shame, and/or humiliation to the named Plaintiff and would otherwise cause such effects to be felt by a person of ordinary sensibilities.

258.    The named Plaintiff's confidential medical information was shared publicly by Defendant in an effort to coerce and otherwise compel Plaintiff to comply with its vaccination requirement. Defendant's conduct to collect, disseminate, and failure to safeguard the named Plaintiff's medical information regarding their medical capabilities, medical preferences, and medical status violates the ordinary decencies recognized in our society.

259.    The actions Defendant, as set out herein, violate Alabama state law.

260.    As a result of the actions of Defendant, the named Plaintiff has been and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

## VII.    PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests the Court enter judgment against Defendant and provide Plaintiff the following relief:

a)    Acceptance of jurisdiction of this cause;

b)    A declaratory judgment that Defendant's COVID-19 Policies and employment practices challenged herein violate Plaintiff's rights afforded under the ADA;

c)    A declaratory judgment that Defendant's COVID-19 Policies and employment practices challenged herein violate Plaintiff's rights afforded under § 504;

d)    A declaratory judgment that Defendant's COVID-19 Policies and employment practices challenged herein violate Plaintiff's rights under the First Amendment to the U.S. Constitution;

e) A declaratory judgment that Defendant's COVID-19 Policies and employment practices challenged herein violate Plaintiff's rights under the Fourteenth Amendment's due process clause of the U.S. Constitution;

f) A declaratory judgment that Defendant's COVID-19 Policies and employment practices challenged herein violate Plaintiff's under the RFRA;

g) A declaratory judgment that Defendant's COVID-19 Policies and employment practices challenged herein violate Plaintiff's fundamental civil rights and liberties concerning privacy under 42 U.S.C. § 1983;

h) A declaratory judgment that Defendant has violated Alabama state laws;

i) A temporary and permanent injunction against Defendant, and their partners, officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs, usages, religious and disability discrimination, and retaliation by such Defendant set forth herein;

j) An Order requiring Defendant to initiate and implement programs that provide (i) equal employment opportunities for all employees, regardless of their protected characteristic; (ii) remedy the effect of Defendant's past and present unlawful employment practices; and eliminate the continuing effects of the discriminatory, retaliatory, and harassing practices described above;

k) An Order requiring Defendant to initiate and implement systems of assigning, training, transferring, compensating, and promoting employees on religious, disability, and other constitutionally recognized rights in a non-discriminatory manner;

l) An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in this section, which would provide for (i) the monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that

50

injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (h) and (i);

m) An award of back pay; front pay; lost job benefits; preferential rights to jobs, and other equitable relief for Plaintiff;

n) An award of nominal, compensatory, and punitive damages for all legal relief sought in this Complaint;

o) An award of litigation costs and expenses, including reasonable attorney's fees to the Plaintiff;

p) Prejudgment interest;

q) Such other, further and different relief as the Court may deem just and proper; and

r) Pursuant to *Federal Rules of Civil Procedure* 38, Plaintiff demands a jury trial on all issues upon which there is a federal right to a jury trial.

## **VERIFICATION**

I, BRIAN A. DASINGER, am over the age of eighteen years and counsel for all Plaintiff in this action.  The statements and allegations included in the foregoing Complaint are based upon reports and information known to me, provided to me by the Plaintiff, and/or furnished to me and that I declare under penalty of perjury that everything represented herein is true to the best of my knowledge, information, and belief.  Dated this 11th day of June 2024.

Date: June 11, 2024

Respectfully submitted,

**LAW OFFICES OF BRIAN A DASINGER**

*/s/ Brian A. Dasinger*
BRIAN A. DASINGER (DAS003)
bdasingerpc@gmail.com
BRIAN A. DASINGER, P.C.
22811 U.S. Highway 98, Suite 3
Fairhope, Alabama 36532
Tel: (251) 928-5588
Fax: (251) 928-8855
*Attorney for Plaintiff*